UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON D. SHEPHERD,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>MONTGOMERY,<br><br>　　　　　Respondent. | No. 2: 14-cv-1314 JAM KJN P<br><br>ORDER & FINDINGS &<br>RECOMMENDATIONS |

I. <u>Introduction</u>

　　　Petitioner is a state prisoner, proceeding without counsel, with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2010 conviction for second degree murder (Cal. Penal Code § 187(a)), burglary (Cal. Penal Code § 459), unlawful use of personal identifying information (Cal. Penal Code § 530.5(a)), and forgery (Cal. Penal Code § 470). Petitioner is serving a sentence of fifteen years to life plus three years, four months.

　　　This action proceeds on the amended petition filed July 11, 2014. (ECF No. 15.) The amended petition raises four claims of jury instruction error and one claim of ineffective assistance of counsel.

　　　In the answer, respondent addresses the claims raised in the amended petition. Respondent also addresses a claim not raised in the amended petition, but raised in the petition for review filed in the California Supreme Court: the trial court violated petitioner's right to due

1  process by permitting the jury to convict him of murder solely on the basis of the uncorroborated
2  testimony of an accomplice. Although it does not appear that petitioner raises this claim in his
3  federal petition, in an abundance of caution, the undersigned addresses this claim herein.

4  The court record contains the petition for review filed in the California Supreme Court on
5  behalf of petitioner's brother and co-defendant, Shawn Shepherd. Respondent informally
6  provided the undersigned with a copy of petitioner's petition for review. Accordingly, respondent
7  is ordered to lodge a copy of petitioner's petition for review in the court record within ten days of
8  the date of this order.

9  After carefully reviewing the record, the undersigned recommends that the petition be
10  denied.

11  II. Standards for a Writ of Habeas Corpus

12  An application for a writ of habeas corpus by a person in custody under a judgment of a
13  state court can be granted only for violations of the Constitution or laws of the United States. 28
14  U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or
15  application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California,
16  202 F.3d 1146, 1149 (9th Cir. 2000).

17  Federal habeas corpus relief is not available for any claim decided on the merits in state
18  court proceedings unless the state court's adjudication of the claim:

19  (1) resulted in a decision that was contrary to, or involved an
20  unreasonable application of, clearly established Federal law, as
    determined by the Supreme Court of the United States; or

21  (2) resulted in a decision that was based on an unreasonable
22  determination of the facts in light of the evidence presented in the
    State court proceeding.

23

24  28 U.S.C. § 2254(d).

25  Under section 2254(d)(1), a state court decision is "contrary to" clearly established United
26  States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in
27  Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a
28  decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537

1  U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).

2  Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'") (internal citations omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 131 S. Ct. 770, 786 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). If there is no reasoned decision, "and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Harrington, 131 S. Ct. at 784-85. That presumption may be overcome by a showing that "there is reason to think some other explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

"When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits – but that presumption can in some limited circumstances be rebutted." Johnson v. Williams, 133 S. Ct. 1088, 1096 (Feb. 20, 2013). "When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of the claim. Id., at 1097.

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal court conducts an independent review of the record.

1 "Independent review of the record is not de novo review of the constitutional issue, but rather, the
2 only method by which we can determine whether a silent state court decision is objectively
3 unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). Where no reasoned
4 decision is available, the habeas petitioner has the burden of "showing there was no reasonable
5 basis for the state court to deny relief." Harrington, 131 S. Ct. at 784. "[A] habeas court must
6 determine what arguments or theories supported or, . . . could have supported, the state court's
7 decision; and then it must ask whether it is possible fairminded jurists could disagree that those
8 arguments or theories are inconsistent with the holding in a prior decision of this Court." Id. at
9 786.

10 III.  Factual Background

11       The opinion of the California Court of Appeal contains a factual summary. After
12 independently reviewing the record, the undersigned finds this summary to be accurate and
13 adopts it herein.

> In May 2008, Jason and Shawn were living with their uncle Bishop in Bishop's two–bedroom Sacramento apartment. Also living with them were Jason's girlfriend, Monique Sprague, and Sprague's four–year–old son. [Footnote 1.]
>
> > [Footnote 1: Sprague testified for the People under a plea agreement where she pled guilty to forgery and being an accessory in exchange for serving a year in custody and testifying truthfully at trial.]
>
> In the middle of the night on Wednesday, May 7, 2008 (when according to Sprague she and Jason were using methamphetamine), Sprague discovered her underwear missing from the dresser she kept in the living room. She told Jason, and he suspected Bishop was the culprit because a few years back Bishop had taken Jason's daughter's and mother's underwear. Jason said he was going to "kick [Bishop's] ass." [Footnote 2.]
>
> > [Footnote 2: Sprague testified she and Jason used methamphetamine 8 or 10 hours before the eventual fight with Bishop, which was about the missing underwear. Sprague further testified Jason did not sleep that entire night and he was fuming about the missing underwear.]
>
> When Bishop came out of the shower and was in his own bedroom, Jason confronted him, and Bishop asked what he had done. Jason told him that he knew what he had done and that he was going to "kick [his] ass." Bishop then pushed Jason, and Jason hit him in the jaw with his fist. Bishop stumbled back, but then, according to

Jason, Bishop came at Jason with a pocketknife and tried to stab him. Jason reached out his hand to stop the knife from coming at him. Jason and Bishop wrestled over the knife, and Jason ended up pushing himself off of Bishop. Jason then grabbed a baseball bat that was near the door and hit Bishop on the side of the head two or three times. Bishop fell to the ground in a fetal position away from Jason with his feet tucked up and his head up by the wall. He was bleeding from his ear. He was not moving but sounded like he was breathing. Jason put the knife in his own pocket.

Jason left Bishop's room, and Sprague bandaged his hand in the hallway, which by Jason's estimation took about 10 minutes. [Footnote 3.]

> [Footnote 3: Jason testified he realized his hand was cut from the scuffle at the time he picked up the knife.
>
> In a police interview, Shawn said Jason cut his hand himself while using his own pocketknife.
>
> Sprague testified Jason told her he did not know how he had sustained the cut but he was going to say Bishop came at him with a knife. She further testified that shortly after the scuffle and when she was with Jason in the apartment, Jason made a stabbing motion with his hands to describe what had happened between him and Bishop, and Sprague took his gestures to mean that Jason had stabbed Bishop. Sprague was aware that Jason owned a number of pocketknives.
>
> The knife that apparently was used in the scuffle had blood on the blade. The blade had DNA from Bishop's blood and DNA from Jason, but Jason's DNA was not from his blood.

Jason decided to tie up Bishop "[i]n case he were to ... wake back up" and retaliate and went back into Bishop's room. Jason had Shawn go into Bishop's room with him and when Shawn did, Shawn stared at their uncle who was still in the same fetal position. Shawn asked Jason "what the hell was going on." Jason yelled at Shawn to either help him find something with which to tie up Bishop or to grab him some rope that was on the floor. Shawn handed Jason some rope. Jason took the rope and grabbed whatever other cords he could find and tied up Bishop's hands, feet, and neck. As Jason was tying Bishop up, he was not fearful of an imminent attack by Bishop. Jason and Shawn were in the bedroom for about 10 minutes. [Footnote 4.]

> [Footnote 4: Jason testified he did not ask Shawn to help him tie up Bishop and that Shawn did not help him do so. However, Jason told police he had Shawn help tie up Bishop, and they used whatever was accessible to do it. Sprague testified she heard Jason telling Shawn to find something with which to tie up Bishop and then telling Shawn to tie up Bishop's legs and hands.]

////

> Jason then went to Circle K to buy cigarettes. He returned 15 to 20 minutes later and asked Shawn to check on Bishop. Shawn did, and according to Jason, Shawn said Bishop was dead. According to Sprague, Bishop had not died yet, as she heard gurgling sounds coming from Bishop's bedroom through the night or the next morning (which was Thursday, May 8). According to a neighbor who lived beneath Bishop's apartment, somewhere between 8:00 a.m. and 10:00 a.m. on Friday, May 9, which was the neighbor's birthday, she heard a loud thud upstairs followed by a male's voice moaning in pain. The moaning petered out about 10 to 15 minutes later.
>
> Upon Jason's return from Circle K, Jason told Shawn that he was going to cash Bishop's IRS refund check and use the money to leave. Jason asked Shawn and Sprague to help him search for it. Jason found the check, and Sprague forged Bishop's signature on the check. Jason then called a friend and asked him how to cash a check without identification. The friend told him to use a Vcom machine, which is similar to an ATM machine and permitted cashing a government check.
>
> According to Jason, he then made two trips to Vcom machines to cash the check. However, photographs taken by the Vcom machines showed a different person trying to cash the check on each of the two occasions (one appeared to be Jason and the other Shawn) and there was handwriting on the back of one of the Vcom receipts that contained Bishop's identifying information that appeared not to be Jason's handwriting (and could have matched Shawn's). The check was declined both times. Jason pawned Bishop's pool cue to get money to leave town.
>
> On May 9, 2008, at 9:09 a.m., Jason and Shawn rented a U–Haul truck in Sacramento. They drove the U–Haul truck back to Bishop's apartment and loaded his dead body into a garbage can and then into the truck. Jason and Shawn dumped Bishop's body off a bridge in Jackpot, Nevada.
>
> On June 16, 2008, Bishop's body was discovered by kayakers in Twin Falls, Idaho. His body was extensively decomposed. His neck, arms, legs, and ankles were bound together with one continuous rope. The way the rope was tied, if Bishop were to have moved his arms and legs, a slip knot would have tightened around his neck. There was also a green bungee cord wrapped around each ankle and an electric cord wrapped twice around his left foot. There was a laceration on his right frontal scalp and beneath that laceration his skull was fractured. The cause of death was blunt force head injuries that could have been caused by a baseball bat.

People v. Shepherd, 2012 WL 4358619 at *1-3 (2012).

////

////

////

IV. <u>Legal Standards</u>

    A. <u>Legal Standard for Claims Alleging Jury Instruction Error</u>

In general, a challenge to jury instructions does not state a federal constitutional claim. See <u>Waddington v. Sarausad</u>, 555 U.S. 179, 192 n.5 (2009) ("we have repeatedly held that 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions,'" quoting <u>Estelle v. McGuire</u>, 502 U.S. 62, 67–68 (1991)). In order to warrant federal habeas relief, a challenged jury instruction cannot be merely "undesirable, erroneous, or even 'universally condemned,'" but must violate some due process right guaranteed by the fourteenth amendment." <u>Cupp v. Naughten</u>, 414 U.S. 141, 146 (1973). To prevail on such a claim petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the resulting conviction violates due process.'" <u>Prantil v. State of Cal.</u>, 843 F.2d 314, 317 (9th Cir. 1988) (quoting <u>Darnell v. Swinney</u>, 823 F.2d 299, 301 (9th Cir. 1987)). The Due Process Clause "safeguards not the meticulous observance of state procedural prescriptions, but 'the fundamental elements of fairness in a criminal trial.'" <u>Rivera v. Illinois</u>, 556 U.S. 148, 158 (2009) (quoting <u>Spencer v. Texas</u>, 385 U.S. 554, 563-64 (1967)). The Supreme Court has defined "very narrowly" the category of infractions that violate fundamental unfairness. <u>Dowling v. United States</u>, 493 U.S. 342, 352 (1990). In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'" <u>Prantil</u>, 843 F.2d at 317 (quoting <u>Bashor v. Risley</u>, 730 F.2d 1228, 1239 (9th Cir. 1984)).

Finally, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief if the unconstitutional instruction had a substantial influence on the conviction and thereby resulted in actual prejudice under <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993), which is whether the error had substantial and injurious effect or influence in determining the jury's verdict. See <u>Hedgpeth v. Pulido</u>, 555 U.S. 57, 61–62 (2008) (per curiam).

////

////

B. <u>Legal Standard for Claim Alleging Ineffective Assistance of Counsel</u>

The clearly established federal law governing ineffective assistance of counsel claims is <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), which requires a petitioner to show that (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." <u>Id.</u> at 687.  To establish deficient performance, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness" and "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." <u>Id.</u> at 688, 687.  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a "strong presumption" that counsel's conduct falls within the "wide range" of reasonable professional assistance.  <u>Id.</u> at 687.  To establish prejudice, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u> at 694.  A court "asks whether it is 'reasonable likely' the result would have been different....The likelihood of a different result must be substantial, not just conceivable."  <u>Harrington v. Richter</u>, 562 U.S. 86, 111–12 (2011) (citing <u>Strickland</u>, 466 U.S. at 696, 693).

V. <u>Discussion</u>

Petitioner pursued a direct appeal in state court, but did not file any habeas corpus petitions in state court.

The California Court of Appeal is the last state court to issue a reasoned decision addressing the claims raised in the amended petition.  Accordingly, the undersigned gives the California Court of Appeal's opinion deference pursuant to 28 U.S.C. § 2254(d).

A. <u>Claim 1:  Alleged Jury Instruction Error</u>

In claim 1 petitioner argues,

> A defendant who initiates a simple assault is entitled to rely on self-defense when the victim escalates the fight by responding with deadly force and the defendant cannot retreat to safety.

(ECF No. 15 at 4.)

////

1    In his direct appeal, petitioner argued that the trial court incorrectly instructed the jury
2    regarding when a defendant, who initiates a simple assault, is entitled to rely on self-defense
3    when the victim escalates the fight by responding with deadly force. The undersigned construes
4    claim 1 of the amended federal petition to be raising this related, and exhausted, jury instruction
5    error claim.

   The California Court of Appeal denied this claim for the reasons stated herein.

> The Court's Instruction On The Right To Self–Defense By An Initial Aggressor (CALCRIM No. 3471) Was Correct
>
> Jason contends the court's instruction on the right to self–defense by an initial aggressor was incorrect, in violation of his federal constitutional rights. The court instructed pursuant to CALCRIM No. 3471 that "If you decide that the defendant, Jason Shepherd, started the fight using non–deadly force and the opponent responded with such sudden and deadly force that the defendant *could not withdraw from the fight*, then the defendant had the right to defend himself with deadly force and was not required to stop fighting." (Italics added.) Jason argues the court erred in using the words "'could not withdraw from the fight'" instead of "could [not] retreat *in safety*." We reject Jason's contention because the California Supreme Court has used these terms interchangeably.
>
> Specifically, in People v. Hecker (1895) 109 Cal. 451, the court stated the defendant was entitled to an instruction justifying the murder if the defendant "was put in such sudden jeopardy by the acts of deceased that he *could not withdraw* ...." (Id. at p. 461, italics added.) Later in the opinion, the court explained the same concept as follows: "the counter assault [by the deceased] be so sudden and perilous that no opportunity be given to decline or to make known to his adversary his willingness to decline the strife, *if he cannot retreat with safety*, then as the greater wrong of the deadly assault is upon his opponent, he would be justified in slaying, forthwith, in self–defense." (Id. at p. 464, italics added.)
>
> Based on our Supreme Court's usage of the two terms interchangeably, we reject Jason's contention the instruction on self–defense was wrong.

People v. Shepherd, 2012 WL 4358619 at *3.

   In this claim, petitioner argues that CALCRIM 3471 misstated California law.

   The U.S. Supreme Court has "repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (internal quotation marks omitted) (emphasis added); see also Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996)

9

(federal court must accept state court's interpretation of its own law).  Accordingly, this court is bound by the California Court of Appeal's finding that CALCRIM 3471 correctly stated California law.  Accordingly, this claim should be denied.

### B. Claim 2: Alleged Jury Instruction Error

Petitioner alleges that the trial court erred when it instructed the jury that it could determine the degree of homicide solely from petitioner's statements to the police.  The California Court of Appeal denied this claim for the reasons stated herein:

> The Court's Instruction On Corpus Delicti (CALCRIM No. 359) Was Correct
>
> Jason contends the court undercut the People's burden of proof when it instructed that the jury could determine the degree of homicide solely from his statements to police. Specifically, the court instructed that "[a] defendant may not be convicted of any crime based on his out of court statements alone" but that "[i]dentity of the person who committed the crime and the degree of the crime may be proved by the defendant's statement alone." (CALCRIM No. 359.) Jason is wrong because of California Supreme Court precedent to the contrary.
>
> Specifically, in People v. Cooper (1960) 53 Cal.2d 755, our Supreme Court rejected the defendant's contention that the People must establish that the murders were of the first degree by evidence other than his extrajudicial statements. (Id. at p. 765.) The court explained as follows: "'[The] corpus delicti in a case involving first degree murder consists of two elements, namely, the death of the victim and the existence of some criminal agency as the cause. [Citations.] Once prima facie proof of the corpus delicti is made, the extrajudicial statements, admissions, and confessions of a defendant may be considered in determining whether all the elements of the crime have been established.' [Citation.] 'The corpus delicti of the crime of murder having been established by independent evidence, ... extrajudicial statements of the accused ... may be used to establish the degree of the crime.'" (Ibid.)
>
> Based on our Supreme Court's approval of a defendant's extrajudicial statements to establish the degree of murder, we reject Jason's contention the instruction on corpus delicti was wrong.

People v. Shepherd, 2012 WL 4358619 at *3-4.

In essence, petitioner argues that the California law providing that the degree of a crime may be established by a defendant's extrajudicial statements alone is unconstitutional.

The corpus delicti rule generally requires "that a defendant's confession requires some independent corroborating evidence in order to serve as the basis for a conviction." United States

10

v. Lopez–Alvarez, 970 F.2d 583, 589 (9th Cir. 1992). Although the rule is applied in federal courts in federal prosecutions, it has not been held by the Supreme Court a requirement under the Constitution. See West v. Johnson, 92 F.3d 1385, 1393–94 (5th Cir. 1996) (corpus delicti rule not shown to be a constitutional requirement in a sufficiency of the evidence claim); Evans v. Luebbers, 371 F.3d 438, 442–43 (8th Cir. 2004) ("no constitutional rights are at stake" in corpus delicti argument in sufficiency of evidence claim); Lopez v. Allison, 2014 WL 3362228, at *7 (E.D. Cal. July 8, 2014) (corpus delicti rule matter of state law). Accordingly, petitioner's claim that CALCRIM 359 violated constitutional law by instructing that the degree of a crime may be found based on a defendant's extrajudicial statements alone is without merit.

To the extent petitioner may be arguing that California law requires that the degree of a crime may not be found based on a defendant's extrajudicial statements alone, this claim is also without merit. The California Court of Appeal found that CALCRIM 359 correctly stated California law. This court is bound by the California Court of Appeal's interpretation of state law. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (internal quotation marks omitted) (emphasis added); see also Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996) (federal court must accept state court's interpretation of its own law).

For the reasons discussed above, this claim should be denied.

### C. Claim 3: Alleged Jury Instruction Error and Ineffective Assistance of Counsel

Petitioner alleges that the trial court erred in failing to instruct the jury regarding voluntary intoxication. Petitioner also alleges that trial counsel was ineffective for failing to request a voluntary intoxication jury instruction. The California Court of Appeal denied these claims for the reasons stated herein.

> The Court Did Not Err In Refusing To Sua Sponte Instruct On Voluntary Intoxication, And Jason's Counsel Was Not Ineffective
>
> Jason contends the trial court's failure to provide instructions on intoxication relating to imperfect self–defense and heat of passion and his counsel's failure to request those instructions violated his constitutional rights to a fair trial and effective assistance of counsel. We disagree.
>
> The court must instruct sua sponte on the effect voluntary intoxication can have upon a defendant's ability to form the

11

> requisite criminal intent "'when the evidence warrants and the defense is not inconsistent with the defendant's theory of the case.'" (People v. Ivans (1992) 2 Cal.App.4th 1654, 1661.) If the evidence of intoxication is "at most minimal" the court is not required to give the instructions. (People v. Williams (1988) 45 Cal.3d 1268, 1311.) "However, an intoxication instruction is not required [even] when the evidence shows that a defendant ingested drugs or was drinking, unless the evidence also shows he became intoxicated to the point he failed to form the requisite intent or attain the requisite mental state." (Ivans, at p. 1661.)
>
> Here, the evidence of intoxication was minimal and did not show that Jason was intoxicated to the point he could not form the requisite specific intent. Sprague testified she and Jason used methamphetamine 8 or 10 hours before the fight with Bishop. She did not know whether the methamphetamine had any effect on Jason. When Jason was under the influence of methamphetamine, Sprague recalled he would be moody, irritable, and unable to sleep. Jason testified he had not used methamphetamine that day. He slept from about 1:00 a.m. to about 7:30 a.m. and was not in a "crazed state" when he fought with Bishop. From this evidence, the most that can be said is that even if Jason had consumed methamphetamine, it was 8 to 10 hours before the fight and there was no evidence on this occasion it affected him by the time he fought Bishop. The court therefore had no sua sponte duty to instruct on voluntary intoxication.
>
> Similarly, defense counsel was not ineffective for deciding not to ask for instructions on voluntary intoxication because his decision was a rational trial tactic. (See People v. Bradford (1997) 14 Cal.4th 1005, 1052 [appellate courts reverse convictions on the ground of inadequate counsel only if the record affirmatively discloses that counsel had no rational tactical purpose for his act or omission].) In closing, defense counsel decided to argue that Sprague was lying about Jason's drug use on the night before the fight. Sprague's testimony that Jason had ingested methamphetamine was part and parcel of her testimony that she found her underwear missing when she and Jason were getting high and told Jason about it at that time. If the jury credited Sprague's testimony, it might have decided that Jason had more time to premeditate and deliberate about killing Bishop, with little chance the jury would find Jason was in fact still under the influence of methamphetamine during the killing that occurred many hours later, thereby leading to a first degree murder conviction.

People v. Shepherd, 2012 WL 4358619 at *4.

In the instant case, the jury was instructed as to the lesser included offenses of heat of passion voluntary manslaughter and imperfect self-defense voluntary manslaughter. (CT at 1438-39.) Petitioner argues that the trial court erred by failing to sua sponte instruct the jury regarding the effects of voluntary intoxication on these lesser included offenses.

12

The United States Supreme Court has held that the failure to instruct on a lesser included offense in a capital case is constitutional error if there was evidence to support the instruction. Beck v. Alabama, 447 U.S. 625, 638, 638 (1980). The Supreme Court, however, has not decided whether to extend this rationale to non-capital cases. The Ninth Circuit has declined to extend Beck to find constitutional error arising from the failure to instruct on a lesser included offense in a non-capital case. See Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam) (in non-capital case, failure of state court to instruct on lesser included offense does not alone present a federal constitutional question cognizable in a federal habeas corpus proceeding). Accordingly, petitioner's claim challenging the trial court's failure to sua sponte instruct the jury on involuntary intoxication as it related to the lesser included offenses of heat of passion and imperfect self-defense voluntary manslaughter does not raise a constitutional claim.

The Ninth Circuit has recognized that "the *refusal* by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim" under clearly established federal law. Solis, 219 F.3d at 929 (emphasis added). However, as indicated by his related ineffective assistance of counsel claim, petitioner's counsel did not ask for instructions regarding the effects of voluntary intoxication on heat of passion and imperfect self-defense voluntary manslaughter. Petitioner has not cited –and the court is unaware of – any authority for the proposition that it is a violation of due process for the trial court not to sua sponte instruct the jury on a lesser included offense. See Bradley v. Biter, 2014 WL 5660682, at *7 (C.D. Cal. Nov. 4, 2014) (finding no authority for proposition that a trial court's failure to sua sponte instruct the jury on a lesser included offense violates a petitioner's due process rights).

For the reasons discussed above, petitioner's claim alleging that the trial court failed to sua sponte instruct the jury regarding voluntary intoxication should be denied.

For the following reasons, the undersigned finds that petitioner's trial counsel was not ineffective for failing to request an instruction regarding voluntary intoxication as it related to voluntary manslaughter based on heat of passion and imperfect self-defense.

////

A person kills in a heat of passion where (1) the victim's conduct is "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection" and (2) they actually kill under a heat of passion caused by the victim's conduct. People v. Esquival, 2015 WL 1260317 at *9 (2015) (quoting People v. Manriquez, 37 Cal.4th 547, 583–584 (2005). "Thus, '[t]he heat of passion requirement for manslaughter has both an objective and a subjective component.'" Manriquez, 37 Cal.4th at 584 (quoting People v. Wickersham, 32 Cal.3d 307, 326-27 (1982).

"With respect to heat of passion, it is undisputed that voluntary intoxication has no bearing on the objective element – whether 'an average sober person would be so inflamed that he or she would lose reason and judgment.'" People v. Esquival, 2015 WL 1260317 at *11 (quoting Manriquez, 37 Cal.4th at 586). In the instant case, petitioner testified that he confronted Bishop because he believed that Bishop had stolen Sprague's underpants. (RT at 1123, 1128.) Petitioner also testified that he was not happy with Bishop because Bishop was angry with him for letting Bishop's son into Bishop's room the previous day to check on him. (Id. at 1128.) Petitioner also testified that he had recently found out that Bishop had molested petitioner's mother several years earlier. (Id. at 1124.) The undersigned finds that no average sober person would be so inflamed by these circumstances, alone or combined, that they would lose reason and judgment and kill another person. Accordingly, petitioner was not prejudiced by trial counsel's failure to request an involuntary intoxication instruction as it related to heat of passion voluntary manslaughter.

The undersigned next turns to petitioner's claim that trial counsel was ineffective for failing to request a voluntary intoxication instruction as to imperfect self-defense voluntary manslaughter.[1]

////

---

[1] Whether, under California law, evidence of voluntary intoxication is relevant to imperfect self-defense voluntary manslaughter is not entirely clear. See People v. Logwood, 2016 WL 1385164 at *8 (2016). However, assuming evidence of voluntary intoxication was and is relevant to imperfect self-defense voluntary manslaughter, the undersigned finds that trial counsel was not ineffective in failing to request this instruction.

14

Imperfect or unreasonable self-defense involves a "subjectively" real but "objectively" unreasonable" belief in the need to defend. People v. Humphrey, 13 Cal.4th 1073, 1082 (1996). It applies where "[a] defendant who makes a factual mistake misperceives the objective circumstances," but not where "[a] delusional defendant holds a belief that is divorced from the circumstances." People v. Elmore, 59 Cal.4th 121, 137 (2014).

As noted by the California Court of Appeal, in closing argument, petitioner's counsel argued that Sprague was not telling the truth when she testified that petitioner had stayed up all night after taking methamphetamine. (RT at 1405-06, 1410-11.) The California Court of Appeal found that petitioner's trial counsel made this argument for a tactical reason, i.e.,

> If the jury credited Sprague's testimony, it might have decided that Jason had more time to premeditate and deliberate about killing Bishop, with little chance the jury would find Jason was in fact still under the influence of methamphetamine during the killing that occurred many hours later, thereby leading to a first degree murder conviction.

People v. Shepherd, 2012 WL 4358619 at *4.

Defense counsel has leeway to make strategic decisions at trial and "need not request instructions inconsistent with its trial theory." Butcher v. Marquez, 758 F.2d 373, 377 (9th Cir. 1985). Here, petitioner's counsel made a tactical decision to defend the case by arguing that, during the night prior to the killing, petitioner slept and did not use methamphetamine, in order to minimize any evidence of premeditation and deliberation. This tactical decision was reasonable because the evidence of petitioner's intoxication, which came in through Sprague's testimony, was not strong. Thus, the California Court of Appeal reasonably determined that counsel's failure to request a voluntary intoxication instruction, which would have been at odds with his argument that there was insufficient evidence of premeditation and deliberation, was a reasonable tactical one, and did not amount to deficient performance. See, e.g., Matylinsky v. Budge, 577 F.3d 1083, 1092 (9th Cir. 2009) (finding defense counsel's decision not to request instructions on manslaughter and provocation was not unreasonable where the petitioner failed to show that counsel's selected strategy of pursuing an intoxication defense was unreasonable); Turk v. White, 116 F.3d 1264, 1266–67 (9th Cir. 1997) (concluding that once counsel reasonably selects a

15

1  defense, failing to present an alternative and inconsistent defense is not ineffective assistance of
2  counsel); Butcher, 758 F.2d at 376–377 (concluding that counsel was not ineffective for choosing
3  to forego a voluntary manslaughter jury instruction when the defense theory was that defendant
4  did not commit the charged act, not that he committed it under provocation); Carrillo v.
5  Hernandez, 2014 WL 103109, at *18 (C.D. Cal. Jan. 8, 2014) (finding no ineffective assistance
6  where counsel did not request a lesser included instruction that was arguably inconsistent with the
7  defense theory presented at trial).

8   For the reasons discussed above, the undersigned finds that petitioner is not entitled to
9  relief as to this claim.

10   D.  Claim 4:  Alleged Jury Instruction Error

11   Petitioner alleges that the trial court erred in failing to instruct the jury on the lesser
12  included offense of unlawful-act involuntary manslaughter.  The California Court of Appeal
13  denied this claim for the reasons stated herein:

> The Court Properly Did Not Instruct On Unlawful Act Involuntary Manslaughter
>
> Jason contends the trial court erred in failing to instruct on unlawful act involuntary manslaughter. His theory is that the jury could have found he assaulted Bishop with a deadly weapon (the baseball bat) but without malice or intent to kill.
>
> Involuntary manslaughter of the unlawful act variety requires a killing during "'an unlawful act, not amounting to a felony,'" i.e., a misdemeanor, that is dangerous to human life under the circumstances of its commission. (People v. Cox (2000) 23 Cal.4th 665, 667, 675–676.) "If a defendant commits an act endangering human life, without realizing the risk involved, the defendant has acted with criminal negligence. By contrast where the defendant realizes and then acts in total disregard of the danger, the defendant is guilty of murder based on implied malice. [Citation.] Thus the pivotal question here [for an instruction on involuntary manslaughter] was whether there was sufficient evidence for a reasonable juror to find [the defendant] acted without consciously realizing the risk to [the victim's] life." (People v. Evers (1992) 10 Cal.App.4th 588, 596.)
>
> In Evers, there was not. The defendant argued that his two–year–old stepson's death "was the result of his inexperience as a parent in handling children and not the product of his conscious disregard of the risk to [the child's] life." (People v. Evers, supra, 10 Cal.App.4th at pp. 593, 596–597.) The Evers court disagreed: "The severity of [the victim's] injuries on this occasion makes clear that

16

> whoever abused [him] had to know such abuse would likely cause serious injury or death. The undisputed evidence showed [the victim] was physically abused with 'major force' causing injuries equivalent to those resulting from a 10– to 30–foot fall." (Id. at p. 597.)
>
> The same is true with respect to the force and injuries here. While Jason testified he did not know at the time that hitting Bishop with a baseball bat two to three times "up side the head" could kill him, the severity of the injuries leaves no doubt that Jason had to have been aware of the risk. An upset and angry Jason swung a baseball bat and hit Bishop two or three times on the side of the head, causing Bishop's skull to fracture. Bishop died from the blunt force head injuries. Blunt force trauma causing the victim's skull to fracture was certainly severe enough that the court could have concluded Jason had to know such an attack would likely cause serious injury or death, thereby obviating the need to instruct on unlawful act involuntary manslaughter.

People v. Shepherd, 2012 WL 4358619 at *5.

As discussed above, there is no clearly established federal law that requires a state trial, in a non-capital case, court to give a lesser included offense instruction as would entitle a petitioner to relief. See Beck v. Alabama, 447 U.S. 625, 638 (1980); Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000) (per curiam). Accordingly, this claim of jury instruction error is not cognizable for federal habeas relief.

The Ninth Circuit has recognized that "the refusal by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim" under clearly established federal law. Solis, 219 F.3d at 929. However, the record indicates that petitioner's counsel did not request an instruction regarding unlawful act involuntary manslaughter. (See CT at 1370-71 (jury instructions refused); petitioner's opening brief on appeal at 63-72.)

For the reasons discussed above, the undersigned finds that petitioner is not entitled to relief as to this claim.

E. Claim 5: Alleged Jury Instruction Error/Due Process

Petitioner alleges that the trial court erred by permitting him to be convicted of murder solely on the basis of uncorroborated testimony from an accomplice, i.e., Sprague, who received a favorable deal. The California Court of Appeal denied this claim for the reasons stated herein.

17

> ### The Court Accurately Instructed On Accomplice Testimony
>
> Jason and Shawn contend the trial court violated their right to due process of law by permitting the jury to convict them of murder based solely on the uncorroborated testimony of an accomplice (Sprague).
>
> The instruction about which defendants complain was CALCRIM No. 334, which here stated as follows: "If you decide that Monique Sprague was an accomplice, then you may not convict the defendants of forgery based on her statements or testimony alone. [¶] ... [¶] You may use the statement or testimony of an accomplice to convict the defendant only if[:] [¶] One. The accomplice's statement or testimony is supported by other evidence that you believe. [¶] Two. Supporting evidence is independent of the accomplice[']s statement or testimony. [¶] And three. That supporting evidence tends to connect the defendant to the commission of the crimes."
>
> There was nothing wrong with the court limiting the accomplice corroboration requirement to forgery because Sprague was an accomplice only to forgery. "An accomplice is ... one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (Pen.Code, § 1111.) Sprague was an accomplice to forgery because it was she who forged Bishop's signature on the check. Conversely, there was no evidence Sprague was involved in Jason's beating of Bishop or Jason's and Shawn's tying up of Bishop. Where, as here, the witness (Sprague) was an accomplice to only one of the crimes she testified about, the corroboration requirement applied only to that one crime and not the others she testified about. (See, e.g., People v. Wynkoop (1958) 165 Cal.App.2d 540, 545–546.) "In such cases, the court may insert the specific crime or crimes requiring corroboration in the first sentence." (Bench Notes to CALCRIM No. 334 (2012) p. 111.) The court's instruction in keeping with these principles did not violate defendants' rights.

People v. Shepherd, 2012 WL 4358619 at *5-6.

Petitioner's claim alleging that he was convicted of murder based on the uncorroborated testimony of accomplice Sprague fails for the following reasons. First, as noted by the California Court of Appeal, Sprague was not an accomplice to murder.

Second, even assuming Sprague was an accomplice, the "Fourteenth Amendment does not forbid a state court to construe and apply its laws with respect to the evidence of an accomplice." Lisenba v. California, 314 U.S. 219, 227 (1941). While California law requires that accomplice testimony be corroborated, the corroboration of accomplice testimony is not constitutionally mandated. See United States v. Augenblick, 393 U.S. 348, 352 (1969) ("When we look at the

18

requirements of procedural due process, the use of accomplice testimony is not catalogued with constitutional restrictions."); Laboa v. Calderon, 224 F.3d 972, 979 (9th Cir. 2000) ("[a]s a state statutory rule, and to the extent that the uncorroborated testimony is not 'incredible or substantial on its face,' [Section 1111] is not required by the Constitution or federal law"; citations omitted); United States v. Lopez, 803 F.2d 969, 973 (9th Cir. 1986) ("The uncorroborated testimony of an accomplice is enough to sustain a conviction unless the testimony is incredible or unsubstantial on its face.).

For the reasons discussed above, the undersigned finds that petitioner is not entitled to relief as to this claim.

Accordingly, IT IS HEREBY ORDERED that within ten days of the date of this order, respondent shall lodge petitioner's petition for review; and

IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  Any response to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: September 15, 2016

Sheph1314.157(2)

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE